## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| GRADY KITTRELL, MICHAEL GRIMES, CRAIG THOMAS, JAMEY SAXON IRA, SANDRA SAXON IRA, JAMEY SAXON, M. LEDBETTER TRUST, LAUREN ROBERTS, ZACH DAVIS, LISA JANE HADLEY, JILL HADLEY, SARAH BUFFTON, MICHAEL HAYDEL, ROBERT MOORE, ADRIANNE CHRISTY IRA, DR. KAHLID DIAB, | Case No. _____ <br><br> Hon. _____ |
| Plaintiffs, | |
| v. | |
| CRAIG ALLEN, an individual, MELLISSA TARKENTON-ALLEN, an individual, VIRGINIA VOHS, an individual, C.M. ALLEN CAPITAL MANAGEMENT, INC., a Georgia corporation, MARY ELAINE ALLEN, an individual, TEDDY ALLEN, an individual, CHARLOTTE ALLEN, an individual, and BEN ALLEN, an individual, | **COMPLAINT AND JURY DEMAND** |
| Defendants. | |

Dickinson Wright PLLC
Jeffrey Melcher (GA Bar No. 501150)
Mitch Reber
424 Church Street, Suite 800
Nashville, Tennessee 37219
(615) 620-1701
(313) 223-3623
jmelcher@dickinsonwright.com
mreber@dickinsonwright.com
*Attorneys for Plaintiffs*

1

Plaintiffs Grady Kittrell, Michael Grimes, Craig Thomas, Jamey Saxon IRA, Sandra Saxon IRA, Jamey Saxon, M. Ledbetter Trust, Lauren Roberts, Zach Davis, Lisa Jane Hadley, Jill Hadley, Sarah Buffton, Michael Haydel, Robert Moore, Adrianne Christy IRA, and Dr. Kahlid Diab, (collectively, "Plaintiffs"), through their counsel, Dickinson Wright, PLLC, and for their Complaint against Defendants, Craig Allen, Mellissa Tarkenton-Allen, Virginia Vohs, and C.M. Allen Management Capital, Inc., Mary Elaine Allen, Teddy Allen, Charlotte Allen, and Ben Allen, allege as follows:

## NATURE OF THE ACTION

*"I reported gains when we had losses . . . there is no money left."*
- Defendant Craig Allen

1.      Cheetah – Craig Allen – Atlanta means fast and loose, that is with other people's money slipped into the figurative waistband. Craig Allen purported to sell securities promising extraordinary returns, but instead diverted other people's money, including one elderly person's life savings, to the tune of almost $10 million to furnish an extravagant lavish lifestyle. Craig Allen accomplished this by stealing from unsuspecting investors, including taking investments by some to make payments to others, with such a "con" known worldwide as a Ponzi scheme. The Cheetah flag bearer would hide behind his wife's maiden name – Tarkenton – to give himself undeserved credibility. More than that, Melissa Tarkenton-Allen

2

("Tarkenton")[1] demonstrated not only knowledge of elements of Craig Allen's fraudulent scheme but actively endeavored to secrete her husband's whereabouts upon discovery of the massive fraud.

2.      This is a RICO and securities fraud case. Defendant Craig Allen's "The Cheetah Fund L.P." ("the Fund") was the limited partnership vehicle that Craig Allen used to induce the Plaintiffs, a group of individuals, to entrust their money to him to invest. The Fund is an enterprise that C.M. Allen Capital Management, Inc., its general partner, operates and controls, and which in turn, is a corporation that Defendant Craig Allen wholly owns and operates.

3.      After receiving a collective investment of more than $9,850,000 from Plaintiffs, Defendants Craig Allen and Tarkenton began stealing money from the Fund so that they could maintain a lavish and extravagant lifestyle. While perpetrating the fraud, Defendant Craig Allen concealed his acts of fraud and embezzlement by forging counterfeit financial statements and disseminating the fraudulent documents to investors, and statements by Defendant Tarkenton evidence her knowledge of falsified documents. Indeed, Defendant Craig Allen provided

---

[1] Defendant Tarkenton refers to herself as "Melissa Tarkenton-Allen" in public statements, on Facebook and on Instagram. Examples include https://www.bizjournals.com/atlanta/potmsearch/detail/submission/6535201/Melissa_Tarkenton_Allen, https://www.linkedin.com/posts/atlanta-agent_home-adds-two-more-agents-atlanta-agent-activity-7112074131503816704-g_kO, and https://atlantaagentmagazine.com/tag/melissa-tarkenton-allen/.

Plaintiffs with fabricated financial statements that reflected the Fund was profitable, when, in reality, the Fund was experiencing losses (which Defendants were compounded by making unauthorized withdrawals for their personal use). Not only did these fabricated financial documents induce Plaintiffs into believing that their investments were profitable, but the falsified documents also motivated some Plaintiffs to invest even more money with the Fund. Further, as a result of Defendant Craig Allen's fraudulent issuance and transmission of IRS K-1 tax forms electronically and via overnight mail that reported gains instead of losses, Defendant Craig Allen caused Plaintiffs to incur significant and unsubstantiated income tax liabilities.

4.     As further described below, the repeated and continuous pattern of unlawful and criminal acts committed by Defendants here gives rise to RICO liability, as well as liability under federal securities laws and numerous state laws.

5.     Notably, when Plaintiffs, prior to engagement of counsel, confronted Defendant Craig Allen with evidence of his fraud, Defendant Craig Allen chose to "come clean," and asked that the Plaintiffs seek civil remedies (*i.e.*, a "confession of judgment"). Recognizing immediately that his fraudulent activity with Cheetah Fund rose to a level of a violation of several federal and state criminal laws, Defendant Craig Allen essentially begged Plaintiffs not to get federal authorities involved, as Defendant Craig Allen acknowledged readily to Plaintiffs that he likely

4

would face would imprisonment as a direct consequence of his actions. Unlike the Cheetah pole setter, Defendant Tarkenton did not confess. Instead, she continued concealing the fraud and the fact that she (and her children) had enjoyed and were continuing to enjoy the ill-gotten gains they derived from Craig Allen's Ponzi scheme and fraud.

## THE PARTIES

6.     Plaintiff Grady Kittrell is a limited partner of The Cheetah Fund L.P. and is an individual who is domiciled in Florida. In total, Mr. Kittrell wire transferred approximately $300,000 to The Cheetah Fund L.P. for Defendant Craig Allen to invest and manage.

7.     Plaintiff Michael Grimes is a limited partner of The Cheetah Fund L.P. and is an individual who is domiciled in Florida. In total, Mr. Grimes wired approximately $2,750,000 to The Cheetah Fund L.P. for Defendant Craig Allen to invest and manage.

8.     Plaintiff Craig Thomas is a limited partner of The Cheetah Fund L.P. and is an individual who is domiciled in Florida. In total, Mr. Thomas wired approximately $850,000 to The Cheetah Fund L.P. for Defendant Craig Allen to invest and manage.

9.     Plaintiff Jamey Saxon IRA is a limited partner of The Cheetah Fund L.P. and is a legal entity owned and controlled by Plaintiff Jamey Saxon (Alabama).

The Jamey Saxon IRA wired approximately $317,000 to The Cheetah Fund L.P. for Defendant Craig Allen to invest and manage.

10.    Plaintiff Sandra Saxon IRA is also a limited partner of The Cheetah Fund L.P. The Sandra Saxon IRA wired approximately $145,000 to The Cheetah Fund L.P. for Defendant Craig Allen to invest and manage.

11.    Plaintiff Jamey Saxon is a limited partner of The Cheetah Fund L.P. and is an individual who is domiciled in Alabama. In total, Mr. Saxon wired approximately $350,000 to The Cheetah Fund L.P. for Defendant Craig Allen to invest and manage.

12.    Plaintiff M. Ledbetter Trust is a limited partner of The Cheetah Fund L.P. In total, the M. Ledbetter Trust wired approximately $100,000 to The Cheetah Fund L.P. for Defendant Craig Allen to invest and manage.

13.    Plaintiff Lauren Roberts is a limited partner of The Cheetah Fund L.P. and is an individual who is domiciled in Florida. In total, Ms. Roberts wired approximately $250,000 to The Cheetah Fund L.P. for Defendant Craig Allen to invest and manage.

14.    Plaintiff Zach Davis is a limited partner of The Cheetah Fund L.P. and is an individual who is domiciled in Florida. In total, Mr. Davis wired approximately $550,000 to The Cheetah Fund L.P. for Defendant Craig Allen to invest and manage.

15.     Plaintiff Lisa Jane Hadley is a limited partner of The Cheetah Fund L.P. and is an individual who is domiciled in Alabama. In total, Lisa Jane Hadley wired approximately $350,000 to The Cheetah Fund L.P. for Defendant Craig Allen to invest and manage.

16.     Plaintiff Jill Hadley is a limited partner of The Cheetah Fund L.P. and is an individual who is domiciled in Alabama. In total, Jill Hadley wired approximately $400,000 to The Cheetah Fund L.P. for Defendant Craig Allen to invest and manage.

17.     Plaintiff Sarah Buffton is a limited partner of The Cheetah Fund L.P. and is an individual who is domiciled in Alabama. In total, Ms. Buffton wired approximately $200,000 to The Cheetah Fund L.P. for Defendant Craig Allen to invest and manage.

18.     Plaintiff Michael Haydel is a limited partner of The Cheetah Fund L.P. and is an individual who is domiciled in Louisiana. In total, Mr. Haydel wired approximately $500,000 to The Cheetah Fund L.P. for Defendant Craig Allen to invest and manage.

19.     Plaintiff Robert Moore is a limited partner of The Cheetah Fund L.P. and is an individual who is domiciled in Alabama. In total, Mr. Moore wired approximately $100,000 to The Cheetah Fund L.P. for Defendant Craig Allen to invest and manage.

20.     Plaintiff Adrianne Christy IRA is a limited partner of The Cheetah Fund L.P. In total, the Adrianne Christy IRA wired approximately $100,000 to The Cheetah Fund L.P. for Defendant Craig Allen to invest and manage.

21.     Plaintiff Dr. Kahlid Diab is a limited partner of The Cheetah Fund L.P. and is an individual who is domiciled in Florida. In total, Dr. Diab wired approximately $100,000 to The Cheetah Fund L.P. for Defendant Craig Allen to invest and manage.

22.     Defendant C.M. Allen Capital Management, Inc. is a Georgia corporation with its principal place of business at 2485 W. Wesley Road, N.W., Atlanta, Georgia 30327. C.M. Allen Capital Management, Inc. is the general partner of The Cheetah Fund L.P. Defendant Craig Allen wholly owns and controls C.M. Allen Capital Management, Inc. is wholly owned and controlled by.

23.     Defendant Craig Allen is the *de facto* general partner of The Cheetah Fund L.P., through his control and management of his solely-owned corporation C.M. Allen Capital Management, Inc. At all relevant times, Defendant Allen was domiciled at 3233 Andrews Court, N.W., #14, Atlanta, Georgia 20205.

24.     C.M. Allen Capital Management, Inc. identifies Defendant Virginia Vohs as its Director of Operations.

25.    Defendant Melissa Tarkenton-Allen is Craig Allen's wife. Upon information and belief, at all relevant times, Tarkenton was domiciled at 3233 Andrews Court, N.W. #14, Atlanta, Georgia 20205.

26.    Defendant Mary Elaine Allen is Craig Allen's child who is a relief defendant and a recipient of ill-gotten gains derived by Craig Allen's fraudulent scheme. Upon information and belief, at all relevant times, she was domiciled at 3233 Andrews Court, N.W. #14, Atlanta, Georgia 20205.

27.    Defendant Teddy Allen is Craig Allen's child who is a relief defendant and a recipient of ill-gotten gains derived by Craig Allen's fraudulent scheme. Upon information and belief, at all relevant times, he was domiciled at 3233 Andrews Court, N.W. #14, Atlanta, Georgia 20205.

28.    Defendant Charlotte Allen is Craig Allen's child who is a relief defendant and a recipient of ill-gotten gains derived by Craig Allen's fraudulent scheme. Upon information and belief, at all relevant times, she was domiciled at 3233 Andrews Court, N.W. #14, Atlanta, Georgia 20205.

29.    Defendant Ben Allen is Craig Allen's child who is a relief defendant and a recipient of ill-gotten gains derived by Craig Allen's fraudulent scheme. Upon information and belief, at all relevant times, he was domiciled at 3233 Andrews Court, N.W. #14, Atlanta, Georgia 20205.

## JURISDICTION

30.     A significant portion of the events that give rise to this Complaint took place in Fulton County (Atlanta), Georgia.

31.     Plaintiffs seek relief under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, which establishes a basis for subject matter jurisdiction under 28 U.S.C. § 1331.

32.     Plaintiffs also seek relief under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"), which confer subject matter jurisdiction with this court pursuant to 28 U.S.C. § 1331.

33.     Venue is proper in this judicial district because a substantial part of the events and/or omissions giving rise to Plaintiffs' claims occurred within the district; Defendants are domiciled in the district, and the Exchange Act provides for nationwide service of process (15 U.S.C. § 78aa(a)).

34.     Further, this Court has supplemental jurisdiction over Plaintiffs' state law claims because they are so related to the RICO and federal securities laws violations that they form part of the same case and controversy under Article III of the United States Constitution.

35.     The exercise of personal jurisdiction here comports with constitutional due process requirements and Georgia's long-arm statute (§ 9-10-91).

## GENERAL ALLEGATIONS

36.     In 2017, Plaintiff Grady Kittrell met Defendant Craig Allen in Atlanta, Georgia.

37.     Defendant Allen told Mr. Kittrell that he dealt in securities investments and venture capital projects, and that he managed his own hedge fund called The Cheetah Fund L.P ("the Fund").

38.     Defendant Allen touted the success of the Fund and his experience as an investor. When boasting about his success as a hedge fund manager, Defendant Allen often bragged that he helped manage his father-in-law's money, referring to the father of co-Defendant Tarkenton. Defendant Allen's father-in-law is a well-known retired professional football quarterback who played 18 seasons in the National Football League.

39.     In 2019, after a couple years of knowing Defendant Allen, Defendant Allen informed Mr. Kittrell that Defendant Allen would be opening the Fund to outside investors.

40.     During Defendant Allen's conversation with Mr. Kittrell (as well as conversations Defendant Allen later had with other investors), Defendant Allen made the following representations:

      a. Defendant Allen represented that the Fund had several million dollars in assets under management (AUM).

b.  Defendant Allen represented that a third-party accounting firm, Elliot Davis, was the Fund's Auditor and performed all the accounting and financial recordkeeping for the Fund.

c.  Defendant Allen represented that a third party, Apex Clearing Corporation, was the Fund's Prime Broker.

d.  Defendant Allen represented that Defendant Allen's brother, as well as The Investment Law Group, performed legal work for the Fund, (Defendant Allen's brother practices securities law).

e.  Defendant Allen represented that the Fund had an average annual return rate of more than 35%, and the fund had been operating for more than 20 years.

f.  Defendant Allen represented that the Fund did not have a management fee. Instead, the Fund's general partner was entitled to 20% of net profits of the Fund if the Fund exceeded a 10% rate of return.

41.    Defendant Allen made the same or similar representations to Mr. Kittrell's business associates, also Plaintiffs, in an effort to pursue each of them, separately, to invest in the Fund.

42.    Initially, Defendant Allen presented directly the investment opportunity to Mr. Kittrell, Lisa Hadley, Michael Grimes, and Jamey Saxon.

43.     During an initial/introductory telephone call, Defendant Allen discussed the Fund, his general investment strategy, and the fact that the fund was structured to prohibit payment of management fees to Defendant Allen until after the Fund had exceeded a 10% rate of return during a four-quarter period (at which point the management fee was 20% of net profits).

44.     Also, Defendant Allen offered to reduce the one-year lockup period to six months and claimed to have lowered the minimum investment from $200,000 to $100,000 in order to further induce these individuals (Mr. Kittrell, Ms. Hadley, Dr. Grimes, and Ms. Saxon) into investing in the Fund.

45.     As a result of the telephone call with Defendant Allen, Mr. Kittrell, Ms. Hadley, Dr. Grimes, and Ms. Saxon, that is each of them individually, independently and directly, invested in the Fund and became limited partners. Specifically, Mr. Kittrell invested approximately $200,000; Ms. Hadley invested approximately $250,000; Dr. Grimes invested approximately $250,000; and Ms. Saxon invested $250,000.

46.     Defendant Allen began issuing statements and monthly reports of the Fund's performance to these individuals (Mr. Kittrell, Ms. Hadley, Dr. Grimes, and Ms. Saxon). The statements and monthly reports usually reported healthy returns conveying to these Plaintiffs that their investments were appreciating in value.

47.    The following year, in 2020, Defendant Allen contacted other business associates from Mr. Kittrell's network to induce them into investing in the Fund.

48.    Indeed, Defendant Allen quickly developed relationships with Mr. Kittrell's network of business associates, each of whom Defendant Allen viewed as potential investors, and solicited more investments from these individuals into the Fund.

49.    Defendant Allen would distribute K-1 statements and other financial documents to the Fund's limited partners that purported to be issued by the Fund's Auditor, Elliott Davis. The Fund's financial statements routinely appeared on Elliott Davis letterhead (with Elliot Davis trademarks and copyrights plainly and prominently displayed on the statements that Defendant Allen distributed).

50.    Further, Defendant Allen made explicit representations that Elliot Davis was handling the Fund's accounting. For example, in October 2022, Defendant Allen told Plaintiff Michael Grimes that Elliot Davis had made an accounting error related to Dr. Grimes's returns and that "[t]hey are amending the K-1" to reflect a lower return.

51.    Typically, Defendant Allen would send these financial documents on Elliot Davis letterhead to limited partners via overnight mail.

52.     To ensure continued participation and investments into the Fund, Defendant Allen honored redemption requests during the years 2020, 2021, and early 2022.

53.     As a result, Defendant Allen further induced the limited partners into believing that they were experiencing financial gains as Fund investors, as the alleged profits were supported by the fact that Defendant Allen processed and paid redemption requests.

54.     Due to their belief that the Fund was profitable, some Plaintiffs invested additional funds throughout 2020, 2021, and 2022.

55.     By mid-2022, Mr. Kittrell began growing concerned about some of the Fund's financial practices, its recordkeeping, and its lack of transparency. As a result, and to provide reassurance for himself and his various business associates whom Mr. Kittrell either knew or assumed had invested with Defendant Allen, Mr. Kittrell requested that Defendant Allen hire a Net Asset Valuation ("NAV") Consultant and/or have Elliott Davis perform an audit of the Fund.

56.     But, Defendant Allen did not agree to this reasonable request by Mr. Kittrell. In fact, Defendant Allen would often lie to Plaintiffs and say he was moving forward in selecting a NAV Consultant for the Fund.

57.     Then, in October 2022, a number of investors sought from Defendant Allen and the Fund very large redemptions (notably, redemption requests by two

limited partners' whose combined investments totaled most of the Fund's AUM). This time, instead of processing the redemption requests as a matter of course as he had in the past, Defendant Allen started coming up with excuses for why he could not send the requested funds to these two limited partners. Defendant Allen also attempted to dissuade investors from requesting redemptions during this time, as he claimed that the Fund was poised to see significant returns in the upcoming months.

58.    Specifically, on October 25, 2022, Defendant Allen circulated a document that purported to be from the Fund's accounting firm, Elliot Davis, specifically a letter presented on Elliot Davis letterhead. The letter stated that the limited partnership agreement required 30 days' written notice. The letter further stated that the limited partnership agreement provided for a payout schedule that delayed payment to the first day of the following quarter (*i.e.*, "January 1, April 1, July 1, or October 1").

59.    As discussed further below, however, this letter turned out to be a forgery that Defendant Allen, not Elliot Davis, created. Elliot Davis had nothing to do with the drafting or dissemination of the October 25, 2022 letter.

60.    Although the Fund's limited partners disagreed with the letter's interpretation of the limited partnership agreement's redemption procedure, they had no choice but to wait until January 1, 2023 to collect their redemptions. Based on increasing unease about Defendant Allen's responses, Mr. Kittrell began insisting

that Defendant Allen put in place more accountability measures, such as hiring a new fund administrator as of January 1, 2023.

61.     By his lulling actions and fraudulent communications, Defendant Allen had bought for himself until January 1, 2023 to come up with the money to pay out the large redemption requests; money that should have been in the Fund in the first place according to the Fund's statements and the gains that Defendant Allen boasted in his reports to the limited partners.

62.     But Defendant Allen did not honor the redemption requests on January 1, 2023. Instead, on January 9, 2023, Defendant Allen sent an email to all the limited partners that stated he was submitting himself to an alcohol rehabilitation program:

> Dear Limited Partners,
>
> The fund was down approximately 3% in December but we have had a nice start to January – up over 4%.
>
> However, I am giving notification as General Partner that the fund will have no activity and be in cash for 90 days.
>
> I am entering an alcohol rehabilitation program right now and have experienced an intervention from friends and family.
>
> I am going immediately to the rehab facility (almost against my will) and I will be at the rehab facility for 90 days. I know it is the right thing to do to get healthy.
>
> **I will not have a cell phone and I will not have access to a computer for 90 days starting now –** So I will be totally out of pocket and cannot communicate. This is my last email before entering rehab so I will not be able to receive phone calls or emails from this point.

The fund will be in 100% cash for this period and the Fund **will not have any activity.**

I very much look forward to getting healthy and coming back in 90 days to manage the fund and have a great 2023.

I know this is the right thing to do and I believe it will significantly help performance of the Fund when I come out of the program.

I am excited and positive about this very drastic measure but I know it might concern partners. I will be back in the office in 90 days and I will send out an email then. I look forward to having a great year in 2023.

I wish everyone the best and I know getting healthy is the best thing for me and the best thing for the fund.

In fact a break usually is very beneficial in this business so I am excited and confident the Fund will be in great shape in 90 days to have a great year.

Best Regards,

Craig

(emphasis in original).

63.    The very same day, Defendant Allen sent an email to one of the limited partners who had a pending redemption request (Michael Grimes), which stated "I could not do your distribution because the new administrator had not finished valuation work. Grady [Kittrell] insisted on [an] administrator for new year starting Jan[uary] 1[, 2023]." He then signaled that it would be another 90 days before the redemption request could be processed because "I would have to sign it so hopefully they can bring it out to me while in rehab to sign."

18

64.     It is evident from the above emails that Defendant Allen believed he could continue to conceal his fraud for at least another 90 days under the guise of an alcohol rehabilitation program, because the rehabilitation program would purportedly not allow him to be in contact with business partners.

65.     Concerned for Defendant Allen's well-being, Mr. Kittrell traveled to Defendant Allen's home in Atlanta, Georgia to provide moral support.

66.     Upon arriving at Defendant Allen's house, Mr. Kittrell was met at the door by Defendant Tarkenton, Defendant Allen's wife.

67.     Unprompted by any business-related question, Defendant Tarkenton promptly told Mr. Kittrell that the Fund had been liquidated into a cash holdings and insisted that "it was not a Ponzi scheme."

68.     Defendant Tarkenton's affirmative, unprompted statements about the business dealings and affairs of the Fund made it obvious to Mr. Kittrell that she knew specifics regarding the Fund's activities and Fund-related communications.

69.     During Mr. Kittrell's discussion with Defendant Tarkenton, she refused to disclose the whereabouts of her husband.

70.     Defendant Tarkenton's suspicious behavior and refusal to provide any information about her husband's whereabouts made Mr. Kittrell suspicious, and Mr. Kittrell decided to continue to investigate.

71.     In furtherance of his investigation, Mr. Kittrell called Elliot Davis (the Fund's accounting firm) and spoke with one of its partners. The partner informed Mr. Kittrell that Elliot Davis had not provided accounting or auditing services to The Cheetah Fund L.P. for several years.

72.     Also, in furtherance of his investigation, Mr. Kittrell located and contacted Carter Allen, who is Defendant Allen's brother and a securities lawyer in Georgia. Through his discussions with Carter Allen, Mr. Kittrell learned that Carter Allen had not spoken with his brother since 2015; so he did not provide legal services to Defendant Allen or the Fund (which was contrary to Defendant Allen's representations regarding securities counsel to the Fund).

73.     Upon learning that the Elliot Davis documents being sent by Defendant Allen were counterfeit and forgeries, Mr. Kittrell reached out to Defendant Tarkenton to express his concerns.

74.     Again, upon merely mentioning that the limited partners had found "some discrepancies" in the Elliot Davis accounting documents, Defendant Tarkenton quickly stated "**we** let them go. They were too expensive." (emphasis added) Again, these suspicious statements made it clear that Defendant Tarkenton had intimate knowledge of the Fund's business affairs.

75.    Mr. Kittrell then asked that Defendant Tarkenton assist the limited partners in accessing the books and records of the partnership (as was their legal right).

76.    Defendant Tarkenton refused to provide the limited partners with access to any business or personal bank account statements. Instead, she said that she would give Mr. Kittrell access to Defendant Allen's office. Mr. Kittrell had no intention of entering the home of Defendant Allen and Defendant Tarkenton unaccompanied by a third party. Consequently, Mr. Kittrell asked Defendant Tarkenton's brother to accompany Mr. Kittrell. Notably, when Mr. Kittrell arrived to inspect the office in an effort to retrieve and examine the Fund's books and records, the office obviously had been emptied out (*e.g.*, empty drawers and only two documents remained in the room).

77.    Soon thereafter, Defendant Allen began texting and calling Plaintiffs and his family members. In his texts and calls to Plaintiffs, he admitted that he was "on the run," and that he had been "reporting gains when there were losses."[2]

78.    For example, during an interaction with Mr. Kittrell, Defendant Allen admitted that he had been taking money directly from the Fund. Defendant Allen admitted that a review of the Fund's bank statements would show these illegal and

_____

[2] Defendant Allen then began to threaten suicide (citing the fear of prison as a reason to commit suicide).

21

unauthorized withdrawals. Defendant Allen admitted that he had been reporting gains when there were actually losses, and paying redemptions by using investor start-up capital (*i.e.*, the $9,850,000). Defendant Allen told Mr. Kittrell that he would not fight a civil action against him, but would flee and/or commit suicide if the limited partners got federal authorities involved.

79.    In addition to admissions he made to Mr. Kittrell on the phone, Defendant Allen made unequivocal admissions of guilt in text messages. For example, Defendant Allen made the following written admissions to Mr. Kittrell in text messages exchange in January 2023:

> Defendant Allen:   I have "come clean" and told you everything. […]

> Defendant Allen:  There is no money left … a brokerage statement would confirm that … why would I be talking about checking out with a gun if there were money left? It's better for everyone if I was not here. I will get you a statement. I would love to develop a plan [but] I don't know at this point. It's too far gone, the more money I tried the more I lost money.

> Mr. Kittrell: When did you start losing?

> Defendant Allen:   I can't help anyone if I am in jail, least of all the investors.

> Mr. Kittrell: How do you propose to help[?] Where you ever making money or bleeding from the beginning? Were you actually trading? You have destroyed people's lives, Craig.

> Defendant Allen:   If we can all agree that I won't go to jail I will develop/sign or agree to any recovery plan. A confession of judgment to each investor from me would prove I owe them money and I think we could develop a plan. […]

> Defendant Allen:   I reported gains when we had losses. I had to report gains or my family would have starved to death . . .
>
> (*cleaned up*).

80.     Despite his apparent willingness to "come clean," Defendant Allen has remained evasive and "on the run."

81.     The Director of Operations for C.M. Allen Capital Management, Inc., Defendant Virginia Vohs, received payments and compensation from C.M. Allen Capital Management, Inc. through money withdrawn from the Fund.

82.     Defendant Vohs did not provide any services to the Fund (or C.M. Allen Capital Management, Inc., for that matter), so payments from the Fund (the assets of which were Plaintiffs' investments) were sham payments made to benefit Defendant Vohs individually for no consideration provided to the Fund.

83.     Moreover, the payments that Defendant Allen made to Defendant Vohs violated the express terms of the partnership agreement, which does not allow draws on capital unless and until certain profit benchmarks are reached.

84.     Indeed, the Fund does not have a management fee. Instead, the Fund's general partner (C.M. Allen Capital Management, Inc.) only was entitled to 20% of net profits if the Fund exceeded a 10% return rate, which never occurred during the life of Plaintiffs' investments in the Fund.

85.     All payments that Defendant Allen made to Defendant Vohs were wrongful, improper and unjust.

**COUNT 1**
**Violation of the Racketeer Influenced and Corrupt Organizations Act,**
**18 U.S.C. § 1961(c), Against Defendants Craig Allen, Mellissa Tarkenton-**
**Allen, Virginia Vohs, and C.M. Allen Capital Management, Inc.**

86.     Plaintiffs incorporate by reference the preceding factual allegations as though fully stated herein.

87.     Under 18 U.S.C. § 1962(c), it is a criminal offense (to which civil liability stems) to operate a business enterprise through a "pattern of racketeering."

88.     Here, Defendants are culpable persons that conducted the affairs of an enterprise, namely, The Cheetah Fund L.P., through a pattern of racketeering activity.

89.     A "pattern of racketeering activity" exists when two or more "predicate acts" are committed in furtherance of a fraudulent scheme.

90.     Here, as detailed below, Defendants committed a litany of predicate acts that establish a pattern of racketeering activity.

***Predicate Acts of Securities Fraud***

91.     The RICO statute defines "racketeering activity" as, *inter alia*, "fraud in the sale of securities." 18 U.S.C. § 1961(1)(D).

92.     As discussed in more detail below (Count 2), Defendant Craig Allen committed multiple instances of fraud in the sale of securities (*i.e.*, the sale of limited liability partnership interests in The Cheetah Fund L.P.).

24

93.     For instance, Defendant Craig Allen represented to investors that the Fund's general partner would not take a management fee unless it had a return rate of greater than 10%.

94.     However, Defendant Allen took money directly from the Fund— despite the fact that the Fund was not performing at a 10% return rate.

95.     Further, Defendant Allen reported gains to investors when the Fund was, in fact, experiencing losses.

96.     These fraudulent representations relating to the Fund's performance (*i.e.*, realizing gains) resulted in limited partners investing more money in the Fund.

97.     Additionally, as detailed above (and below), Defendant Allen falsified Elliot Davis accounting documents and disseminated them to the limited partners. These falsified documents furthered and concealed Defendants' fraud.

98.     As a direct and proximate cause of Defendant Allen's securities fraud, Plaintiffs suffered significant monetary harm in an amount that exceeds $9,850,000.

### *Predicate Acts of Mail Fraud*
(Indictable Offense Under 18 U.S.C. § 1341)

99.     The RICO statute defines "racketeering activity" as, *inter alia*, any act which is indictable under . . . [18 U.S.C. §] 1341 (relating to mail fraud)[.]" 18 U.S.C. § 1961(1)(B).

100.   Under 18 U.S.C. § 1341, it is a criminal offense to, *inter alia*, devise a scheme or artifice to defraud investors by means of distributing counterfeit articles or securities via U.S. mail.

101.   Here, Defendant Allen committed multiple acts of mail fraud by transmitting, via interstate mail, false statements and falsified documents that led investors to believe that the Fund was experiencing financial gains when, in reality, it was taking losses.

102.   As part of his fraudulent scheme, Defendant Allen mailed falsified financial statements and fabricated K-1 statements to Plaintiffs for the purpose of obtaining more money from Plaintiffs—and for the purposes of concealing the fact that he had stolen a significant amount of Plaintiffs' investment.

103.   These acts, along with other acts of mail fraud (as detailed above and incorporated by reference), were made in furtherance of Defendants' fraudulent scheme and directly and proximately caused Plaintiffs significant financial harm in an amount exceeding $9,850,000.

104.   These acts resulted in additional harm to Plaintiffs as a result of Defendants' fraudulent issuance of K-1 tax forms that reported gains instead of losses, causing Plaintiffs to incurred significant, unsubstantiated income tax liabilities.

105.   Thus, Defendants are indictable for violations of 18 U.S.C. § 1341.

### *Predicate Acts of Wire Fraud*
(Indictable Offense Under 18 U.S.C. § 1343)

106.   The RICO statute defines "racketeering activity" as, *inter alia*, any act which is indictable under . . . [18 U.S.C. §] 1342 (relating to wire fraud)[.]" 18 U.S.C. § 1961(1)(B).

107.   Under 18 U.S.C. § 1343, it is a criminal offense to devise a scheme or artifice for obtaining money by means of false pretenses or representations, by means of wire communication in interstate commerce.

108.   Here, Defendant Craig Allen committed multiple acts of wire fraud by transmitting, via wire in interstate commerce, false statements and falsified documents that led investors to believe that the Fund was experiencing financial gains when, in reality, it was taking losses.

109.   Defendants Melissa Tarkenton-Allen and Virginia Vohs committed multiple acts of wire fraud by sending telephonic communications (texts, calls, bank wires), via wire in interstate commerce, that were intended to conceal Craig Allen's fraud—from which they were at least a knowing accomplice and direct beneficiaries.

110.   These acts, along with other acts of wire fraud detailed above and that were made in furtherance of Defendants' fraudulent scheme, directly and proximately caused Plaintiffs significant financial harm in an amount exceeding $9,850,000.

111.   Thus, Defendants are indictable for violations of 18 U.S.C. § 1343.

27

### *Predicate Acts of Copyright and Trademark Counterfeiting*
(Indictable Offense Under 18 U.S.C. §§ 2319 & 2320)

112.   The RICO statute defines "racketeering activity" as, *inter alia*, any act which is indictable under . . . [18 U.S.C. §] 2319 (relating to criminal infringement of a copyright), . . . [and §] 2320 (relating to trafficking in goods or services bearing counterfeit marks)[.]" 18 U.S.C. § 1961(1)(B).

113.   Under 18 U.S.C. § 2319, it is a criminal offense to knowingly and intentionally infringe upon a copyright.

114.   Under 18 U.S.C. § 2320, it is a criminal offense to knowingly use a counterfeit mark.

115.   Upon information and belief, non-party Elliot Davis is a tax and accounting firm that holds valid and enforceable trademark and copyrights in its name and logo(s).

116.   Here, Defendant Craig Allen violated 18 U.S.C. §§ 2319 and 2320 when he knowingly and intentionally copied Elliot Davis' copyrights and trademarks to further his fraud.

117.   Specifically, as detailed above, Defendant Allen forged documents bearing the Elliot Davis copyright and trademark to dupe Plaintiffs into believing that his investment activities were being audited and/or approved by a neutral, third-party accounting firm.

118.   Defendant Allen's violations of 18 U.S.C. §§ 2319 and 2320 directly and proximately caused harm to Plaintiffs, as it allowed Defendants to prolong and delay Plaintiffs' discovery of Defendants' fraudulent scheme.

119.   Indeed, but-for these violations, Plaintiffs would not have invested additional funds as limited partners of The Cheetah Fund L.P. (funds that were unlawfully diverted by Defendants for their personal financial gain).

120.   Defendants are indictable for violations of 18 U.S.C. §§ 2319 & 2320.

### *Predicate Acts of Spending Ill-Gotten Gains*
(Indictable Offense Under 18 U.S.C. § 1957)

121.   The RICO statute defines "racketeering activity" as, *inter alia*, any act which is indictable under . . . [18 U.S.C. §] 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity)[.]" 18 U.S.C. § 1961(1)(B).

122.   Under 18 U.S.C. § 1957, it is a criminal offense for any individual to knowingly engage in a monetary transaction with criminally-derived property of a value greater than $10,000.

123.   Criminally-derived property means any property that is derived from proceeds obtained from a criminal offense.

124.   Here, Defendants are indictable under this statute because they knowingly engaged in monetary transactions regarding proceeds that were derived as a result of, *inter alia*, their wire and mail fraud (as detailed above).

125.   For instance, Defendant Allen committed fraud to lull Plaintiffs into investing millions of dollars into The Cheetah Fund L.P., which he and his wife then diverted to purchase expensive and luxurious personal property and real estate to their own, personal benefit.

126.   Mrs. Tarkenton-Allen knew that these funds were being unlawfully diverted by her husband, and knowingly spent these funds in interstate commerce via transactions that exceeded $10,000.

127.   Notably, if discovery reveals that Defendants Mary Elaine Allen, Teddy Allen, Charlotte Allen, and/or Ben Allen were aware of their parents' fraud and were in receipt of funds unlawfully diverted as a result of fraud, and knowingly spent such funds in interstate commerce via transactions exceeding $10,000, Plaintiffs reserve their right to amend this Complaint and name these Defendants as part of the RICO conspiracy.

128.   Thus, Defendants are indictable for violations of 18 U.S.C. § 1957.

### *Predicate Acts of Interstate Racketeering*
(Indictable Offense Under 18 U.S.C. § 1952)

129.   The RICO statute defines "racketeering activity" as, *inter alia*, any act which is indictable under . . . [18 U.S.C. §] 1952 (relating to racketeering)[.]" 18 U.S.C. § 1961(1)(B).

130.   Under 18 U.S.C. § 1952, it is a criminal offense for an individual to utilize the mail or any facility in interstate commerce with the intent to, *inter alia*,

manage, carry on, or facilitate "unlawful activity," and that such unlawful activity is later performed or attempted.

131.  "Unlawful activity" is defined as, *inter alia*, acts that are indictable under 18 U.S.C. § 1957.

132.  Upon information and belief, both Defendants utilized facilities in interstate commerce with the intent to, and in-fact performed, unlawful activity.

133.  Indeed, as discussed above, Defendants have committed acts that are indictable under 18 U.S.C. § 1957, which constitutes "unlawful activity" pursuant to 18 U.S.C. § 1952(b)(i)(3).

134.  As a direct and proximate cause of these violations Plaintiffs have suffered financial harm in an amount exceeding $9,850,000.

135.  Thus, Defendants are indictable for violations of 18 U.S.C. § 1982.

**COUNT 2**
**Securities Fraud in Violation of Section 10(b) of the Exchange Act and Rule 10b-5, Against Defendant Craig Allen**

136.  Plaintiffs incorporate by reference the preceding factual allegations as though fully stated herein.

137.  Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by the use of instrumentalities of interstate commerce or the mails, with scienter, (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts

necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

138.   By reason of the foregoing, each of the Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

139.   As a direct and proximate result of Defendants' securities fraud, Plaintiffs have suffered damages in connection with their purchases of securities.

## COUNT 3
### Securities Fraud in Violation of Georgia Uniform Securities Act of 2008 (GA Code § 10-5-51), Against Defendants Craig Allen and C.M. Allen Capital Management Inc.

140.   Plaintiffs incorporate by reference the preceding factual allegations as though fully stated herein.

141.   Defendants, by engaging in the conduct described above, offered or sold a security in the State of Georgia by means of written and/or oral communication that included an untrue statement of a material fact and/or omitted to state a material fact necessary to make the statements made, in the light of the circumstances.

142.   By reason of the foregoing, each of the Defendants violated Section 10-5-51 of the Georgia Uniform Securities Act of 2008.

143.   As a direct and proximate result of Defendants' securities fraud, Plaintiffs have suffered damages in connection with their purchases of securities from Defendants in an amount that exceeds $9,850,000.

144.   Plaintiffs are entitled to recovery of damages and attorney fees under the Georgia Uniform Securities Act of 2008.

## COUNT 4
### Fraudulent Inducement, Against Defendant Craig Allen

145.   Plaintiffs incorporate by reference the preceding factual allegations as though fully stated herein.

146.   During his interactions with Plaintiffs, as potential investors, during 2019 and 2020, Defendant Craig Allen made false representations for the purposes of inducing Plaintiffs to invest their money in The Cheetah Fund L.P.

147.   For example, Defendant Allen represented that he, in his capacity as general partner of the Fund, would not withdraw money from the Fund unless and until the annual rate of return for the Fund exceeded 10%.

148.   This representation was false when made, as Defendant Allen did intend, and did in fact, take money from the Fund prior to the Fund first meeting the 10% rate of return benchmark.

149.   Further, acting as general partner of the Fund, Defendant Allen forged and falsified accounting documents that he disseminated to Plaintiffs (as limited

partners of the Fund), which led Plaintiffs to believe that they were realizing gains and caused some Plaintiffs to invest even more money.

150.   In detrimental reliance on these representations, as well as others like them, Plaintiffs were induced into investing money with the Fund.

151.   In total, Plaintiffs invested approximately $9,850,000 as a direct and proximate cause of Defendant Allen's false representations.

152.   Plaintiffs were justified in relying on Defendant Allen's representations because he held himself out as a sophisticated investor (citing, for example, his experiences managing Fran Tarkenton's investment portfolio).

153.   Plaintiffs were also justified in their reliance on Defendant Allen's (1) marketing materials; (2) boasting of the Fund's 20-year existence, (3) once owning a broker-dealer firm; (4) monthly newsletters, and (5) email updates with market commentary.

154.   Further, it was reasonable for Plaintiffs to rely on documents that had been forged by Defendant Allen because the forged documents presented and appeared as if they were actually issued by the Fund's accounting firm, Elliot Davis.

155.   As a result of Defendant Allen's false representations, Plaintiffs suffered damages and losses that exceed $9,850,000.

## COUNT 5
**Fraudulent Misrepresentation, Against Defendant Craig Allen**

156.   Plaintiffs incorporate by reference the preceding factual allegations as though fully stated herein.

157.   During his interactions with Plaintiffs, as potential investors, during 2019 and 2020, Defendant Craig Allen made misrepresentations to Plaintiffs for the purposes of having Plaintiffs invest their money in The Cheetah Fund L.P.

158.   For example, Defendant Allen misrepresented that he, in his capacity as general partner, would not withdraw funds from the Fund unless and until the annual rate of return for the Fund exceeded 10%.

159.   Further, to promote the appearance of liquidity, Defendant Allen reduced the one-year lockup on redemptions to 6 months (his representations relating to redemption rights also turned out to be false and misleading).

160.   This statement, and others like it, were false when made, as Defendant Allen did intend, and did in fact, take money from the Fund prior to the Fund first meeting the 10% rate of return benchmark.

161.   Further, upon information and belief, Defendant Allen simply never traded much of the money received by the Fund. Instead, he would transfer large sums of money to his personal and/or family member accounts as soon as Plaintiffs wired money to the Fund.

162.   Further, acting in his capacity as general partner of the Fund, Defendant Allen forged and falsified accounting documents that he disseminated to Plaintiffs (as limited partners), which led Plaintiffs to believe that they were realizing gains.

163.   In detrimental reliance on these misrepresentations, as well as others like them, Plaintiffs invested money with the Fund.

164.   In detrimental reliance on these misrepresentations, Plaintiffs did not request redemptions when the Fund started to incur significant losses.

165.   Indeed, in total, Plaintiffs invested over $9,850,000 as a direct and proximate cause of Defendant Allen's misrepresentations.

166.   Plaintiffs were justified in relying on Defendant Allen's misrepresentations because he held himself out as a sophisticated investor and a sophisticated asset manager (citing, for example, his experience managing Defendant Tarkenton's father's investment portfolio, boasting of the Fund's 20-year existence, and claiming to once have owned a broker-dealer firm).

167.   Further, it was reasonable for Plaintiffs to rely on the documents that Defendant Allen forged because they presented and appeared as if they were actually issued by the Fund's accounting firm, Elliot Davis.

168.   As a result of Defendant Allen's misrepresentations, Plaintiffs suffered damages and losses that exceed $9,850,000.

169.   Further, Defendant Allen's fraudulent K-1 tax forms (that reported gains instead of losses) harmed Plaintiffs via additional income tax liabilities.

## COUNT 6
### Fraudulent Concealment, Against Defendants Craig Allen, Mellissa Tarkenton-Allen, Virginia Vohs, and C.M. Allen Capital Management, Inc.

170.   Plaintiffs incorporate by reference the preceding factual allegations as though fully stated herein.

171.   Defendant Craig Allen (as the *de facto* general partner of The Cheetah Fund L.P.), acting through Defendant C.M. Allen Management Capital, Inc. (as the actual general partner of the Fund), forged and falsified accounting documents that he disseminated to Plaintiffs (as limited partners of the Fund), which led Plaintiffs to believe that they were realizing gains.

172.   These forged and falsified documents set forth false statements of fact that led Plaintiffs to believe that they were realizing gains. In reality, however, the Fund was suffering losses, as well as being raided by unauthorized withdrawals by Defendant Allen and Defendant Tarkenton. Thus, these false statements were made for the purpose of concealing Defendants' fraud.

173.   In detrimental reliance on these misrepresentations, as well as others like them, Plaintiffs continued to invest money with the Fund, and did not request redemptions until all their money was gone.

174.   Plaintiffs were justified in relying on these false statements because the forged documents presented as if they were actually issued by the Fund's accounting firm, Elliot Davis.

175.   During Plaintiffs' investigation relating to Defendants' fraud, Mrs. Tarkenton-Allen made false and misleading statements for the purposes of concealing her husband's fraud.

176.   Mrs. Tarkenton-Allen also made false statements of fact for the purposes of concealing her own involvement in the fraudulent scheme and/or her personal use of ill-gotten gains.

177.   Mrs. Tarkenton-Allen also assisted Defendant Allen conceal his fraud by, among other things, (1) propagating to Plaintiffs the story that her husband need to attend a rehabilitation program; (2) making affirmative statements that "this is not a Ponzi scheme" and "we fired Eliot Davis"; (3) emptying our Defendant Allen's office of any documents that evidenced the fraudulent scheme; and (4) refusing to provide documents to which Plaintiffs were legally entitled, like banking records.

178.   As a result of Defendants fraudulent concealment, Plaintiffs suffered damages and losses that exceed $9,850,000.

## COUNT 7
### Breach of Fiduciary Duty, Against Defendants Craig Allen and C.M. Allen Capital Management Inc.

179.   Plaintiffs incorporate by reference the preceding factual allegations as though fully stated herein.

180.   As the general partner of The Cheetah Fund L.P., and as the individual who controls and operates the general partner of the Fund, Defendants Craig Allen and C.M. Allen Capital Management, Inc. owe fiduciary duties to Plaintiffs as limited partners of the Fund.

181.   As detailed above, in breach of their fiduciary duties, Defendants misappropriated investor funds and acted against the interests of the Fund and against the interest of the Fund's limited partners.

182.   As a direct and proximate cause of Defendants' breach of fiduciary duty, Plaintiffs suffered financial harm in an amount exceeding $9,850,000.

## COUNT 8
### Breach of Contract, Against Defendants Craig Allen and C.M. Allen Capital Management Inc.

183.   Plaintiffs incorporate by reference the preceding factual allegations as though fully stated herein.

184.   As the general partner of The Cheetah Fund L.P., and as the individual who controls and operates the general partner of the Fund, Defendants Craig Allen

and C.M. Allen Capital Management, Inc. were bound by contractual obligations set forth in the Fund's limited partnership agreement.

185.   Defendants breached those contractual obligations. For example, Defendants were not permitted to any sort of management fee unless and until the rate of return exceeded 10%.

186.   However, Defendants withdrew money from the Fund without first hitting the 10% return benchmark.

187.   As a direct and proximate cause of this breach of contract, Plaintiffs have suffered financial harm in an amount exceeding $9,850,000.

188.   Further, Defendant Allen's fraudulent K-1 tax forms (that reported gains instead of losses) harmed Plaintiffs via additional income tax liabilities.

## COUNT 9
### Unjust Enrichment, Against Defendants Mary Elaine Allen, Teddy Allen, Charlotte Allen, and Ben Allen

189.   Plaintiffs incorporate by reference the preceding factual allegations as though fully stated herein.

190.   Defendants Craig Allen and Mellissa Tarkenton-Allen conveyed a benefit on Defendants Mary Elaine Allen, Teddy Allen, Charlotte Allen, and Ben Allen by transferring ill-gotten gains—and/or personal property purchased with ill-gotten gains—derived from Defendants Craig Allen and Mellissa Tarkenton-Allen's fraudulent scheme.

191.   Despite admitting to wrongdoing and fraud, neither Defendant Craig Allen, nor Defendant Mellissa Tarkenton-Allen, have returned Plaintiffs money and/or personal property purchased with Plaintiffs' money, retained to the benefit of Defendants Mary Elaine Allen, Teddy Allen, Charlotte Allen, and Ben Allen.

192.   It would be unjust and inequitable for Defendants Mary Elaine Allen, Teddy Allen, Charlotte Allen, and/or Ben Allen to retain the benefit conferred upon them, to the detriment of Plaintiffs, and as a result of Craig Allen and Mellissa Tarkenton-Allen's fraudulent scheme.

193.   This Court is empowered with equitable remedies, which can be utilized in this matter to cure the unjust enrichment of Craig Allen and his family members by, among other things, disgorging ill-gotten money and personal property in possession of these Defendants.

### COUNT 10
**Unjust Enrichment, Against Defendant Virginia Vohs**

194.   Plaintiffs incorporate by reference the preceding factual allegations as though fully stated herein.

195.   Defendants Craig Allen and/or C.M. Allen Capital Management Inc. conveyed a benefit on Defendant Virginia Vohs by transferring ill-gotten derived from the above-described fraudulent scheme.

41

196.   Despite wrongdoing, fraud, and a prohibition against management fees under the partnership agreement, neither Defendant Craig Allen, nor Defendant Virginia Vohs, have returned Plaintiffs' investment.

197.   It would be unjust and inequitable for Defendant Virginia Vohs to retain the benefit conferred upon her, to the detriment of Plaintiffs, and as a result of the above-described fraudulent scheme.

198.   Defendant Virginia Vohs does not provide management services to C.M. Allen Capital Management Inc. or the Fund. Accordingly, Ms. Vohs had reason to believe and/or directly knowledge that payments being made to her by these entities were wrongful and fraudulent.

199.   This Court is empowered with equitable remedies, which can be utilized in this matter to cure the unjust enrichment of Defendant Virginia Vohs by, among other things, disgorging ill-gotten money paid to her pursuant to the above-described fraudulent scheme.

## **REMEDIES AND RESERVATION OF RIGHTS**

200.   The RICO statute authorizes **treble damages**, court costs, and attorney fees. *See* 18 U.S.C. § 1964(c). As detailed above, Plaintiffs damages amount to $9,850,000. Accordingly, pursuant to the express and mandatory damages provisions set forth by this statute, **Plaintiffs are seeking $28,500,000**, plus court costs and attorney fees.

201.  Plaintiffs' claims permit a disgorgement remedy. Plaintiffs are entitled to claw-back any and all ill-gotten gains. Here, Defendant Craig Allen stated to one Plaintiff that "I had to report gains or my family would have starved to death …".[3] This raises the inference that ill-gotten gains were spent to the benefit of his wife (Mrs. Tarkenton-Allen) and/or his children. Plaintiffs reserve the right to pursue transfers and/or fraudulent transfers or property (both real or personal) to any of Defendant Allen's family members, including the reservation of right to join an individual in receipt of such property as a Defendant to this action.

202.  To the extent other bad actors assisted Defendants in concealing or facilitating the fraudulent scheme detailed above, Plaintiffs reserve the right to pursue civil liability against those individuals and join them to this lawsuit.

## **PRAYER FOR RELIEF**

Based on the foregoing factual allegations and legal claims for relief, Plaintiffs respectfully request that this Court:

A.    Enter a Judgment against Defendants for any and all damages (including treble damages) sustained by Plaintiffs arising from the foregoing wrongful and unlawful/criminal acts of Defendants;

---

[3] This was clearly hyperbole. At the time, Defendant Craig Allen lived in a $2.5 million home and had multiple high-end vehicles registered to him and/or his family.

B.      Enter a Preliminary Injunction ordering Defendants not to transfer or sell any assets, personal property, and/or real property;

C.      Enter a Judgment awarding Plaintiffs' costs and reasonable attorneys' fees incurred in connection with the institution and prosecution of this civil action;

D.      Enter a Judgment awarding punitive and/or exemplary damages, as appropriate, in an amount to be determined at trial; and

E.      Order such other and further relief, including equitable relief, as justice may require.

## **<u>JURY TRIAL DEMANDED</u>**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury for each and every issue so permitted by law and statute.

Respectfully Submitted,

Dickinson Wright PLLC

/s/ *Jeffrey Melcher*
Jeffrey Melcher

*Attorneys for Plaintiffs*

4881-8236-5083 v1 [102953-2]